[Cite as *Langdon v. Ohio Dept. of Edn.*, 2017-Ohio-8356.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

MICHELLE L. LANGDON, :

    Appellee, : CASE NO. CA2017-02-025

    - vs - : <u>O P I N I O N</u>
    10/30/2017

:

OHIO DEPARTMENT OF EDUCATION, :

    Appellant. :


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2016-04-0819


Finney Law Firm, LLC, Christopher P. Finney, Brian C. Shrive, 4270 Ivy Pointe Blvd., Suite 225, Cincinnati, Ohio 45245, for appellee

Michael DeWine, Ohio Attorney General, Hannah Stoneburner and Anna M. Seidensticker, Education Section, 30 East Broad Street, 16th Floor, Columbus, Ohio 43215, for appellant


    **PIPER, J.**

    **{¶ 1}** Appellant, the Ohio Department of Education, appeals a decision of the Butler County Court of Common Pleas, reversing the Department of Education's decision to deny appellee, Michelle Langdon, her teaching license while permitting reapplication in 2018 after evaluation and training.

**A. Relevant Facts**

{¶ 2}   Langdon worked as a licensed professional intervention specialist with the Lakota School District as a teacher of disabled high school students.  In 2013, Langdon was placed on paid administrative leave while the school investigated "professional conduct concerns."  She was provided a letter by the school informing her that she could be represented at a fact-finding conference to address these concerns.  Prior to any formal decision or action by the school following the fact-finding conference, Langdon irrevocably resigned her position for "personal reasons."  Langdon then allowed her license to lapse.

{¶ 3}   Langdon applied to renew her license in 2014 and the Department of Education, through the Ohio Board of Education ("the Board"), charged Langdon with eight instances of conduct unbecoming a teacher.  The Board stated its intent to consider whether to limit, suspend, revoke, or permanently revoke or deny her pending application.  The Department of Education sent Langdon a letter with the eight charges, asserting that Langdon (1) made unprofessional and inappropriate comments about students, staff, and parents, (2) made unprofessional posts on social media pertaining to her workplace, (3) revealed details of a student's Individualized Education Program ("IEP") to other parents and students, (4) made inappropriate physical contact with students, (5) used marijuana and asked for marijuana to be delivered on school property, (6) created a hostile learning and working environment for students, staff, and parents, (7) failed to follow IEP instructions for students, and (8) referred to a private nurse working with a student within the school as a "big, gross, disgusting wildebeest."

{¶ 4}   The Department of Education also notified Langdon that she was entitled to a hearing if she requested one within 30 days.  Langdon timely requested a hearing through retained counsel.  At the conclusion of a seven-day hearing, both parties submitted written closing arguments with Langdon alleging she was denied due process.

{¶ 5} The hearing officer issued findings of facts and conclusions of law, which were lengthy and detailed. Specifically addressed was Langdon's claim that she was denied due process, and the hearing officer made an express finding that the Department of Education's notice provided due process and that Langdon "fully participated in the prehearing process" during which time Langdon was permitted to address comments, questions, or concerns. Also during this time, the parties exchanged discovery, including witness lists and exhibits. At the hearing itself, Langdon presented 11 witnesses and 27 exhibits during the seven-day hearing.

{¶ 6} The hearing officer found that Langdon had engaged in conduct unbecoming a teacher in violation of R.C. 3319.31(B)(I) on five of the six grounds pursued by the Department of Education, and recommended that her then-expired license be revoked, her pending application for licensure be denied, and she not be permitted to reapply for a license for at least five years.

{¶ 7} Langdon filed objections to the hearing officer's recommendations with the Board. The Board adopted all of the hearing officer's findings and conclusions, but reduced the sanctions such that Langdon would be permitted to reapply for licensure on or after July 1, 2018 provided that prior to reapplication, Langdon complete a fitness to teach evaluation and complete eight hours of anger management training.

{¶ 8} Langdon then appealed the Board's decision to the Butler County Court of Common Pleas, arguing she was prejudiced by a lack of due process and that the Board's findings and conclusions were not supported by reliable, probative, and substantial evidence. The common pleas court agreed and reversed the Board's decision. The Department of Education now appeals the common pleas court's decision raising the following assignments of error. Given that many of the arguments are interrelated, we will address several assignments of error together.

**B. Due Process**

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE COMMON PLEAS COURT ERRED WHEN IT FOUND THAT THE APPELLEE WAS NOT AFFORDED DUE PROCESS UNDER THE LAW.

{¶ 11} Assignment of Error No. 2:

{¶ 12} THE COMMON PLEAS COURT ERRED WHEN IT APPLIED THE WRONG LEGAL REQUIREMENTS FOR SUFFICIENT PREHEARING NOTICE OF THE ALLEGATIONS UNDER R.C. 119.

{¶ 13} Assignment of Error No. 3:

{¶ 14} THE COMMON PLEAS COURT ERRED BY RULING THAT THE BOARD WAS REQUIRED BUT FAILED TO PROVIDE NOTICE OF THE SPECIFIC INDIVIDUALS ASSERTING ALLEGATIONS AGAINST LANGDON IN COUNTS 1, 3, AND 6.

{¶ 15} Assignment of Error No. 4:

{¶ 16} THE COMMON PLEAS COURT ERRED WHEN IT RULED THAT 'CONDUCT UNBECOMING' IN R.C. 3319.31(B)(1) IS NOT CLEARLY DEFINED SO AS TO AFFORD DUE PROCESS OF LAW.

{¶ 17} The Department of Education's first four assignments of error argue that the common pleas court erred in determining that Langdon was not afforded due process.

{¶ 18} "The Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property, without due process of law." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054 (2000). Ohio also guarantees this right within its Due Process and Remedies Clauses, Section 16, Article I of the Ohio Constitution. The essential components of due process are notice, hearing, and the opportunity to be heard before a competent tribunal. *Denier v. Carnes-Denier*, 12th Dist. Warren Nos. CA2016-02-012 and CA2016-04-022, 2017-

- 4 -

Ohio-334. Opportunity must be afforded the parties in appropriate cases to defend, enforce or protect their rights through presentation of their own evidence, confrontation and cross-examination of adverse witnesses, and oral argument. *Id.*

{¶ 19} Procedural due process is a fluid concept; that is "the concept of due process is flexible and varies depending on the importance attached to the interest and the particular circumstances under which the depravation may occur." *Ohio v. Hochhausler*, 76 Ohio St.3d 455, 459 (1996). Constitutional due process requires that one be advised of the charges and have a reasonable opportunity to meet them by way of a defense or explanation. *First Bank v. Mascrete*, 125 Ohio App.3d 257 (4th Dist.1998).

{¶ 20} In order to comply with due process requirements, notice must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must "set forth the alleged misconduct with particularity." *State ex rel. Johnson v. Perry Cty. Court*, 25 Ohio St.3d 53, 58 (1986). Consequently, procedural due process requires administrative agencies to give fair notice of the precise nature of the charges at issue in the disciplinary action. *Edmands v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 14AP-778, 2015-Ohio-2658.

{¶ 21} Ohio courts have utilized the test articulated by the United States Supreme Court to analyze whether due process is satisfied in an administrative context. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893 (1976). According to *Mathews*, a court must weigh the following three factors to determine whether the process given in the administrative proceeding is satisfactory: (1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest and the probable value of additional procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Id.* at 335.

{¶ 22} While an appellate court's review of a common pleas court's decision

regarding agency decisions usually includes an abuse of discretion standard, issues relating to constitutionality and procedural due process arising from an agency's action are subject to a less deferential standard of review, as they are questions of law and thus are subject to a de novo standard of review by an appellate court. *Krusling v. Ohio Bd. of Pharm.*, 12th Dist. Clermont No. CA2012-03-023, 2012-Ohio-5356, ¶ 9.

{¶ 23} According to R.C. 119.07, Langdon was entitled to notice that included "the charges or other reasons for the proposed action, the law or rule directly involved, and a statement informing the party that the party is entitled to a hearing* * *and that at the hearing the party may present evidence and examine witnesses appearing for and against the party."

## C. Specific Charges

{¶ 24} The record indicates that Langdon was afforded due process regarding her licensure request and the Board's ultimate denial of such. The notice included the eight specific charges that the Department of Education levied against Langdon with specific details that would allow her to understand and defend against the charges. The notice also informed Langdon of her right to a hearing as required by R.C. 119.07.

{¶ 25} Specifically, the eight charges were stated in the notice as follows:

1. During the 2012/2013 school year, while employed at the Lakota Local School District, you made unprofessional, inappropriate and critical comments during school hours about students, staff, and parents, including but not limited to: Students 1, 2 and 3; staff members Michelle Hammond, Kim Crawford and Mike Nicholas; and parents of students 1 and 2. You made these comments to school staff members and students.

2. From 2007 through 2013, while employed at the Lakota Local School District, you exhibited a pattern of writing unprofessional posts about your workplace on your personal social media account.

3. During a school fire drill on or about October 2013, you exited the building with Student 4, displaying a copy of her IEP and complaining loudly about certain details contained in it. Your comments, which were overheard by Student 4, other students,

school staff and parents, were demeaning to Student 4 and constitute an inappropriate breach of confidentiality.

4.  During your employment at the Lakota Local School District, from 2008 through the 2013 school year, you were inappropriately physical with students. You frightened and upset Student 1 when you grabbed and tore his hand away from student aide, Melissa Meyer. You grabbed Student 5's wrist very hard and yanked/jerked her hand causing pain. You grabbed student 6's wrist/hand very hard and jerked her over to a chair. Once at the chair, you put your hands on Student 6's shoulders and pushed her down hard into the chair.

5.  From 2007 through 2010, while employed at the Lakota Local School District, you used an illegal substance, namely marijuana, on more than one occasion. You asked a coworker to provide you the marijuana, including one occasion when you instructed the coworker to bring the marijuana to school and put it in your car, which was parked on school property.

6.  During your employment at the Lakota Local School District, you exhibited a pattern of inappropriate conduct that created a negative and hostile learning and work environment at the school for both students and staff. In particular, you yelled at students 1 through 6 and berated, bullied, and made fun of students 1 through 6, staff members, and the parents of Students 1 and 2.

7.  From August 2013 through September 2013, while employed at the Lakota Local School District, you did not follow the IEP for Student 2. Although Student 2's IEP indicated that he was not to be kept in his wheelchair for long periods of time, you kept him in his wheelchair for most of the class period and did not allow him out of his wheelchair on a regular basis.

8.  During the 2012 and 2013 school year, you referred to a private nurse within the school, Ms. Crawford, as a big, gross, disgusting wildebeest.

{¶ 26}   The Superintendent of Public Instruction included a student key with the notice so that Langdon could identify by name the six students listed in the counts above. The record indicates that Langdon received the notice by certified mail, and thus had specific details as to which students were addressed in the charges.

{¶ 27}   The record demonstrates that fair notice of the precise charges at issue were

given within the notice received by Langdon.[1]  Langdon argued, and the common pleas court agreed, that some of the dates given in the notice were not correct, and that such resulted in a lack of precise nature of the charges.  However, the record is clear that the notice identified each student by name once connected to his or her designated number in the provided key.  Each staff member or co-worker against whom Langdon made inappropriate comments was also named in the charges.  Therefore, details exist within each count, regardless of date, that allowed Langdon to determine what specific instance was being addressed and what details created the basis for alleging conduct unbecoming a teacher.  Given that Langdon herself knew when she was employed with the school, she knew when opportunity for contact with each of the named six students occurred.[2]

{¶ 28}  The due process standard does not require that the allegations pinpoint the exact date and time when an alleged incident was to have occurred.  It is well-settled in constitutional law jurisprudence that due process requirements require only fair notice; not perfect notice.  There is no indication in the record that Langdon was not able to respond to the charges based on the dates included in the notice, or that she was unaware of the charges because more specific dates were not included.  In fact, Langdon mounted a fervent and focused defense to the Department of Education's allegations, which centered on denials, counter-witnesses, and explanations rather than a defense dependent upon a particular date.

{¶ 29}  As will be discussed later, Langdon successfully defended the Department of Education's allegations in several respects, as the hearing officer determined that one charge was unsubstantiated, and several components within other charges were not proven.

---

1. Although the Board only found five of the charges proven, we will nonetheless address all six of the charges pursued by the Department of Education.

2. The record indicates that Langdon had approximately five students in her class at a time.

Although some of the specific dates were not listed in the notice, such did not turn the otherwise fair notice into one that failed to provide due process. The record demonstrates Langdon knew the nature of the charges against her and she was able to reasonably respond to the charges in her defense.

{¶ 30} The record further demonstrates that Langdon was well-aware of the precise instances of alleged conduct unbecoming a teacher, as she presented evidence or testimony specific to the instances, cross-examined the Department of Education's witnesses, and also made detailed arguments as to why each charge was not an instance of conduct unbecoming. There is no indication in the record that the notice letter Langdon received failed to give a fair notice of the charges against her.

{¶ 31} For example, as revealed in the transcript, Langdon's attorney questioned Langdon on the substance of the charges sequentially. Langdon's counsel would make reference to the charge and then ask pointed and specific questions. The hearing officer remarked upon the organized flow of the testimony as being in order with the charges. If Langdon was unaware of the charges, she would not have been able to defend with keen precision and in the specific manner which occurred.

{¶ 32} Of the eight charges, six counts were ultimately pursued by the Department of Education, while Counts 2 and 5 were not. Even so, of the six pursued, only three were challenged by Langdon in her closing argument as being a charge for which she was unaware of the specific nature of the charge.[3] Despite her claims that she did not know what she was defending against, the transcripts and closing arguments demonstrate that Langdon was able to anticipate and provide articulate testimony in an effort to rebut, or explain away, every

---

3. The record demonstrates that the parties exchanged witness lists and copies of the intended exhibits prior to the hearing. This exchange of information illuminated the basis for the charges against Langdon.

charge.[4] While Langdon's defense was unsuccessful on every charge, such does not mean she was unaware of the charges.

Charge 1

{¶ 33} Langdon admitted to taking a photograph of Student 1's teeth for nonschool purposes as was alleged by the Department of Education. Specifically, during the hearing, the state's witnesses testified that Langdon took a photograph of one of her student's teeth and joked about the appearance of the student and his teeth. Langdon admitted to taking the photograph, but claimed that she did so to show a relative a photograph of the student who previously bit her. Langdon knew the specific charge against her was taking a photograph of her student for nonschool purposes, and she admitted to the conduct.

{¶ 34} Additionally, Langdon argued in her closing argument with reference "as to the specific allegations called out by the State." Langdon systematically defended against such allegations. She claimed that she never called Student 1 "gross," she did not disparage dietary restrictions for students, she denied making the statement that as part of her job, she had to "change diapers and all kinds of mess like that," she denied making a comment that Student 2's parents did not care about him because they were too busy with their divorce and hating each other, she did not tell Student 2 that he needed diapers, she was taken out of context in her statements that Student 3's parents would not pay for their child to go on a field trip, she denied calling Ms. Mahoney a "bitch," she denied stating that she hates Ms. Paget, she denied disliking Michelle Hammond, and she admitted to calling Ms. Crawford a wildebeest but denied it had to do with Crawford's size or color.

{¶ 35} These very specific and pointed arguments in her defense demonstrate that Langdon was fully informed and prepared as to what Charge 1 alleged and what the specific allegations were against which she had to defend. She did in fact defend accordingly.

---

4. The record contains 32 defense exhibits, which encompass over 350 pages.

Langdon was given the opportunity to prepare a cogent defense or explanation to each and every allegation during the hearing, and she suffered no lack of due process.

Charge 3

{¶ 36} Regarding the third charge, that Langdon shared details of a student's IEP during a fire drill, Langdon admitted in her closing arguments that she referenced the student's IEP with a parent nearby. Even so, she defended her actions by claiming that the Board was making a "mountain out of a molehill," and that she was only using the IEP paperwork on the day of the fire drill to fan herself. The record indicates that Langdon understood the exact nature of the charge, as she offered specific and pointed details about the incident during the hearing. Specifically, Langdon argued that no one could see the words on the plan because it was in 12-point font, but she clearly admitted to discussing the IEP requirement that Student 4 needed one-on-one care. Nothing in Langdon's attempt to minimize her conduct was dependent upon a specific date. Langdon provided explanations that were responsive to the allegations in an effort to diminish the appearance of her conduct. Nothing reasonably suggests that Langdon was afforded anything other than due process in regard to the third charge as well.

Charge 4

{¶ 37} Regarding the fourth charge, that Langdon was inappropriately physical with students, the record again indicates that Langdon received due process. The charge specifically alleged that Langdon upset Student 1 when she grabbed and tore his hand away from a student aide, grabbed Student 5's wrist very hard and jerked it causing the student pain, grabbed Student 6's wrist and jerked her over to a chair, and pushed on Student 6's 0shoulders to push her down into the chair.

{¶ 38} These allegations within the charge were specific enough to allow Langdon to argue that her actions were permissible within the teaching profession and constituted

necessary contact with her students. Specifically, Langdon responded to the detailed instances in the charge letter by arguing that the hearing officer did not understand what physical contact is permitted in the teaching profession. She also countered that the Department of Education failed to produce testimony establishing what physical contact is permitted between a teacher and students. Her witnesses testified that some physical contact between students and teachers is permitted. Langdon also denied that she ever inappropriately touched the students, and she claimed that the Department of Education's witnesses offered inconsistent testimony.

{¶ 39} While the hearing officer and Board did not find Langdon's testimony and arguments persuasive, her testimony nonetheless demonstrates that she understood the charge against her and she was able to offer specific testimony in her defense. Nothing with this charge was ambiguous or denied Langdon the opportunity to defend.

Charges 6 and 7

{¶ 40} Regarding the sixth and seventh charges that Langdon created a negative and hostile learning and work environment at the school for both students and staff, and that she did not follow the IEP for Student 2, Langdon understood that the charges were specific to each of the students listed in the notice (Students 1-6), staff members she encountered, and the parents of Students 1 and 2. Furthermore, the sixth charge is expressly clear that Langdon was being charged with not following the IEP created for Student 2 in that he should not be kept in his wheelchair for long periods of time.

{¶ 41} In an informed manner, Langdon responded to Counts 6 and 7 together by attempting to impeach and discredit the witness who alleged that Langdon's behavior was inappropriate. Langdon attempted to demonstrate that the witness against her was not credible and was uninformed as to what constituted appropriate interactions between students and teachers. Langdon further suggested that the witness was not sufficiently

educated and had to be admonished for her own inappropriate contact with students. Langdon also presented witnesses to discredit other witnesses called by the Department of Education. Langdon's witnesses opined that Langdon did not create a hostile environment. She further suggested that the Department of Education refused to acknowledge the proper pedagogical purposes of her conduct.

{¶ 42} Specific to her students' IEP and not following what was ordered therein, Langdon explained why she took specific actions specific to the student, but testified that such was "an entirely appropriate teaching technique." In regard to her yelling, Langdon argued that she did not yell, only that she used a specific tone that was "authoritative."

{¶ 43} Again, the detailed testimony and arguments Langdon raised in her defense, as well as calling certain witnesses to rebut allegations, firmly demonstrates that Langdon was aware of the charges against her and that she was given the opportunity to be heard regarding the charges. In fact, for this charge and others, Langdon was fortified with the information necessary to exercise a braced opportunity to defend, enforce, and protect her rights. Langdon presented evidence and testimony, confronted and cross-examined witnesses, and formulated arguments, which were prepared and presented to the hearing officer.

Charge 8

{¶ 44} Regarding the last charge, that Langdon referred to a private nurse as a "big, gross, disgusting wildebeest," Langdon fully admitted to "occasionally and privately" referring to the nurse as "the Wildebeast" [sic] to another school employee. She also noted her regret for doing so. Despite her compunction, however, Langdon's admission clearly indicates that she was well-aware of the charge against her, that she was afforded notice of the charge, and she had the ability to defend against it.

Additional Evidence

**{¶ 45}** In addition to the specific arguments to these charges, Langdon also presented testimony and evidence that she was a caring and effective teacher of multi-handicapped children. She also challenged the Department of Education for being "unprofessional" and "overwrought" in its prosecution of the matter. As will be further discussed below, the common pleas court misplaced reliance upon Langdon's evidence of her caring manner in reversing the Board's decision.

## D. Conduct Unbecoming

**{¶ 46}** Langdon also challenged the interpretation by the Board of the term "conduct unbecoming" by stating that there was no specific definition given nor any way to create a standard by which the hearing officer could apply the facts to determine if her conduct was, in fact, unbecoming a teacher.

**{¶ 47}** Each of the eight counts alleged by the Department of Education against Langdon were cited as violations of R.C. 3319.31(B)(1), which provides:

> For any of the following reasons, the state board of education, in accordance with Chapter 119. and section 3319.311 of the Revised Code, may refuse to issue a license to an applicant; may limit a license it issues to an applicant; may suspend, revoke, or limit a license that has been issued to any person; or may revoke a license that has been issued to any person and has expired: (1) Engaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the applicant's or person's position.

**{¶ 48}** Despite Langdon's argument that the term "conduct unbecoming" was never defined and thus denied her due process, the record clearly demonstrates that all parties, as well as the hearing officer, understood that the "conduct unbecoming" standard at issue was set forth in Ohio Adm.Code 3301-73-21(A). The definition of "conduct unbecoming" found in the Ohio Administrative Code was further interpreted by the Board in the Ohio Licensure

- 14 -

Code of Professional Conduct, which was adopted in 2008.[5]

**{¶ 49}** According to Ohio Adm.Code 3301-73-21:

(A) The state board of education shall consider, but not be limited to, the following factors when evaluating conduct unbecoming under division (B)(1) of section 3319.31 of the Revised Code:

(1) Crimes or misconduct involving minors;

(2) Crimes or misconduct involving school children;

(3) Crimes or misconduct involving academic fraud;

(4) Making, or causing to make, any false or misleading statement, or concealing a material fact in a matter pertaining to facts concerning qualifications for professional practice and other educational matters, or providing false, inaccurate, or incomplete information about criminal history or prior disciplinary actions by the state board or another professional licensing board or entity;

(5) Crimes or misconduct involving the school community, school funds, or school equipment/property, which may include, but are not limited to, unresolved findings for recovery by the state auditor;

(6) A plea of guilty to, or finding of guilt, of a conviction, granting of treatment in lieu of conviction, or a pre-trial diversion program to any offense in violation of federal, state, or local laws and/or statutes regarding criminal activity;

(7) A violation of the terms and conditions of a consent agreement; and

(8) Any other crimes or misconduct that negatively reflect upon the teaching profession, including sanctions and/or disciplinary action by another state educational entity or another professional licensing board or entity.

---

5. The Code of Conduct presents as its first Principle the requirement of professional behavior. "Educators shall behave as professionals realizing that their actions reflect directly on the status and substance of the education profession. An educator serves as a positive role mo0del to both students and adults and is responsible for preserving the dignity and integrity of the teaching profession and for practicing the profession according to the highest ethical standards." The Code of Conduct then goes on to state, "Conduct unbecoming to the profession includes, but is not limited to, the following actions," which include, for example, failing to adhere to the Licensure Code of Professional Conduct for Ohio Educators or disparaging a colleague, peer or other school personnel while working in a professional setting on the basis of race or ethnicity.

The administrative code then offers specific mitigating and aggravating factors that the Board may take into account when determining final action upon a finding of conduct unbecoming.

{¶ 50} This standard was specifically addressed by the Department of Education, and Ohio law is clear that the Board has authority to determine the standards that govern its licenses. *See Haynam v. Ohio State Bd. of Edn.*, 6th Dist. Lucas No. L-11-1100, 2011-Ohio-6499, ¶ 82. In fact, the Ohio Supreme Court has supported agency decision-making authority regarding what rules and standards an agency promulgates. *Arlen v. Ohio, State Med. Bd*, 61 Ohio St.2d 168 (1980). In *Arlen*, the Ohio Supreme Court determined that the State Medical Board is competent to determine whether a physician has failed to conform to a minimum standard of care. In so holding, the court reasoned, the "purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such matters by placing the decision on facts with boards or commissions composed of men equipped with the necessary knowledge and experience pertaining to a particular field." *Id.* at 173.

{¶ 51} The eight factors listed above in the administrative code provide a specific standard for evaluating allegations of "conduct unbecoming" a teacher, and represented specific standards promulgated by the Board. There is no indication in the record that Langdon was operating under any other definition of "conduct unbecoming," or that any of the parties were confused as to the controlling standards. Thus, Langdon was not denied due process based upon the "conduct unbecoming" standard.

### E. Application of *Mathews* Test

{¶ 52} Regarding the *Mathews* test, and after taking into consideration the entire record, we find that Langdon received due process in the administrative context. First, we recognize that Langdon had a private interest in securing a license so that she could return to teaching as a career and source of income. Secondly, the risk of erroneous deprivation

could be considered significant given that Langdon's licensure was at risk. However, and as previously addressed, we find that Langdon was afforded ample safeguards to overcome the threat of erroneous deprivation. Lastly, we recognize that the Board plays a very important role in monitoring who will teach children, and bears a significant duty to regulate educator conduct in Ohio. Specific to the case at bar, the Board must enforce its duty to regulate when licensing educators who work with disabled students.

### F. Concluding Due Process

{¶ 53} The hearing officer's written decision addresses the specific allegations made within each charge and also addresses the evidence offered by both parties in regard to each charge. While the hearing officer ultimately found five of the six charges substantiated, he found one charge unsubstantiated and noted multiple occasions where Langdon was able to show in her defense that an event did not occur in the manner alleged by the Department of Education. The record repeatedly demonstrates that Langdon had notice of the charges against her, as well as a full and fair opportunity to defend and be heard.

{¶ 54} Moreover, it is undisputed that the Department of Education's notice contained a notice of Administrative Procedure, which detailed the process by which Langdon needed to request a hearing in writing within 30 days. The notice also informed Langdon that she had the right to appear at the hearing in person to represent herself, or she could be represented by an attorney or another representative. Langdon was also told that at the hearing she could present her "positions, arguments, or contentions," or that she could prepare and present such in writing. She was also told that at the hearing, she was entitled to present evidence and examine witnesses appearing for or against her. The notice also informed Langdon that her failure to request a hearing as stated would result in the Board determining in her absence whether to revoke her license or take other action.

{¶ 55} After reviewing the record in full, we find that Langdon was afforded due

process because she was informed of the charges against her and was given a full chance to be heard through the seven-day hearing. As such, the Department of Education's first four assignments of error are sustained.

### G. Common Pleas Court's Role in Reviewing the Board's Decision

{¶ 56} The Board's remaining assignments of error essentially challenge the common pleas court's decision to reverse the denial of Langdon's license denial and other sanctions. Those assignments of error are as follows.

{¶ 57} Assignment of Error No. 5:

{¶ 58} THE COMMON PLEAS COURT ERRED WHEN IT FAILED TO DEFER TO THE BOARD'S INTERPRETATION OF CONDUCT UNBECOMING IN ACCORDANCE WITH THE OHIO LICENSURE CODE OF CONDUCT.

{¶ 59} Assignment of Error No. 6:

{¶ 60} THE COMMON PLEAS COURT ABUSED ITS DISCRETION IN FAILING TO FOLLOW THE LIMITED APPELLATE ROLE ASSIGNED TO IT BY R.C. CHAPTER 119.

{¶ 61} Assignment of Error No. 7:

{¶ 62} THE COMMON PLEAS COURT ERRED WHEN IT REVERSED THE BOARD'S DECISION BASED UPON A CONSIDERATION OF ONLY A FRACTION OF THE ADMINISTRATIVE RECORD.

{¶ 63} Assignment of Error No. 8:

{¶ 64} THE COMMON PLEAS COURT ERRED BY MODIFYING THE BOARD OF EDUCATION'S DECISION WITHOUT PROVIDING A LEGAL OR FACTUAL BASIS FOR THE MODIFICATION.

{¶ 65} Assignment of Error No. 9:

{¶ 66} THE COMMON PLEAS COURT ERRED BY NOT AFFIRMING THE BOARD'S ACTIONS WHICH WERE SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL

EVIDENCE AND IN ACCORDANCE WITH LAW.

{¶ 67} Assignment of Error No. 10:

{¶ 68} THE COMMON PLEAS COURT ABUSED ITS DISCRETION BY SUBSTITUTING ITS JUDGMENT FOR THE BOARD WHEN IT REJECTED THE TESTIMONY OF THREE WITNESSES AS NOT RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE.

{¶ 69} Assignment of Error No. 11:

{¶ 70} THE COMMON PLEAS COURT ERRED WHEN IT IMPROPERLY CONSIDERED O.A.C. 3301-73-21(B) INSTEAD OF O.A.C. 33001-73-21(A) [SIC] IN DETERMINING WHETHER LANGDON ENGAGED IN CONDUCT UNBECOMING.

{¶ 71} Within the final seven assignments of error, the Department of Education essentially challenges the decision of the common pleas court on two points. First, the Department of Education argues that the common pleas court used the wrong standard in reviewing the Board's administrative decision. Second, the Department of Education argues that the common pleas court abused its discretion by finding the Board's decision was not supported by the evidence.

### H. Judicial Review of an Agency Decision

{¶ 72} Ohio law is clear that the common pleas and appellate courts have a limited role when reviewing a Board's decision. In an administrative appeal pursuant to R.C. 119.12, the common pleas court reviews an order to determine whether it is supported by reliable, probative and substantial evidence and is in accordance with law. *In re Henneke*, 12th Dist. Clermont No. CA2011-05-039, 2012-Ohio-996, ¶ 88.

{¶ 73} Reliable evidence has been defined as "dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true." *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571

(1992). Probative evidence is "evidence that tends to prove the issue in question; it must be relevant in determining the issue." *Id.* Substantial evidence is evidence "with some weight; it must have importance and value." *Id.*

**{¶ 74}** In determining evidentiary conflicts, common pleas courts are to give deference to the administrative resolution of such conflicts. *University of Cincinnati v. Conrad*, 63 Ohio St.2d 108 (1980). The Ohio Supreme Court noted when the evidence before the common pleas court consists of conflicting testimony of approximately equal weight, the common pleas court "must" defer to the determination of the administrative body, which, acting as the finder of fact, had the opportunity to determine the credibility and weight of the evidence. *Id.* at 111. In fact, "an agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993).

**{¶ 75}** On appeal to an appellate court, the standard of review is more limited. *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707 (1992). In reviewing the common pleas court's determination that an order was or was not supported by reliable, probative and substantial evidence, this court's role is limited to determining whether the common pleas court abused its discretion. *Johnson-Hebb v. Clinton Cty. Pub. Defender*, 187 Ohio App.3d 17, 2010-Ohio-1817, ¶ 5 (12th Dist.). The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶ 76}** After reviewing the record, we find that the common pleas court abused its discretion by (1) not deferring to the Board's resolution of evidentiary conflicts and (2)

determining that the Board's decision was not supported by reliable, probative, and substantial evidence.

### I. Deference to the Board

{¶ 77}  As previously stated, the common pleas court was to give deference to the Board's findings in regard to conflicts in the evidence and credibility.  It did not.  Instead, and within the common pleas court's written decision, it makes reference to testimony from three of the Department of Education's witnesses, and concluded that "their testimony does not rise to the level of reliable, probative and substantial evidence required to support" the Board's decision.

{¶ 78}  However, the common pleas court's only support for this conclusion was its sweeping generalization that it applied to all three witnesses; which was that each witness had a personality conflict with Langdon.  However, no support from the record was given to show that the witnesses' testimony was contradictory, lacked credibility, or should be discounted in favor of Langdon's testimony.  The common pleas court did not conclude, or even analyze, whether the testimony of the witnesses was internally inconsistent, impeached by evidence of a prior inconsistent statement, rested upon improper inferences, or was otherwise unsupportable.  *Ohio Historical Soc.* at 471.  In fact, the common pleas court's decision is void of reference, analysis, or examination of any of the Board's specific findings of fact and conclusions of law as adopted from the hearing officer's decision.[6]

{¶ 79}  Even if the common pleas court found the testimony of all three witnesses internally inconsistent or that such testimony suffered from a fatal flaw as noted above in the legal standard, the court neglected to address the Board's other findings in its decision.

---

6. Langdon's counsel suggested the matter be remanded for the trial court to make additional determinations. Yet, the record is so fully developed to demonstrate that the Board's decision is supported by reliable, probative and substantial evidence that a remand for further determinations is unnecessary.

Nor did the common pleas court address other parts of the record pertaining to the other charges against Langdon. For example, and as will be addressed forthcoming, Langdon did not deny that she took a photograph of a student for non-educational purposes, or that she referred to a student's nurse as a wildebeest. There are multiple facets to the Board's decision, and the common pleas court was dismissive of the Board's entire decision by focusing on a portion of the decision involving three witnesses.

{¶ 80} Moreover, and as previously noted, the common pleas court placed great weight on Langdon's history of teaching and concluded that Langdon was an "advocate" for her students, she "went above and beyond the normal duties of a classroom teacher," and took her own initiative to involve her students in special occasions such as homecoming and prom. While this may all be true, these instances of Langdon's positive conduct were not included in the specific findings made by the Board in regard to whether Langdon engaged in conduct unbecoming. Essentially, the common pleas court made its own findings and determined that such were enough to show that Langdon was entitled to licensure despite the Board's specific finding that she was not.[7]

{¶ 81} After reviewing the record, we find that the common pleas court abused its discretion by not adhering to its limited role in reviewing the Board's decision.

### J. Evidence Supporting Conduct Unbecoming

{¶ 82} As previously noted, the hearing officer found that five of the Department of Education's charges were proven during the hearing. The hearing officer clearly set forth the law regarding what constitutes conduct unbecoming as stated in Ohio Adm.Code 3301-73-21(A) and added emphasis to the sections of that code involving "misconduct" involving

---

7. While the record contains multiple instances of Langdon's positive impact on the school and her students, this evidence would be more pertinent to the mitigating factors discussed in Ohio Adm.Code 3301-73-21(B) when determining sanctions. However, nothing in the statutes or code support the proposition that enough acts of conduct *becoming* a teacher erases even a single act of conduct *unbecoming* a teacher.

children or students, and "misconduct" that negatively reflects upon the teaching profession. After reviewing the record, we find that the common pleas court abused its discretion in finding that the Board's decision was not supported by reliable, probative, and substantial evidence to demonstrate that Langdon engaged in misconduct involving students and misconduct that negatively reflects upon the teaching profession.

Count 1

{¶ 83} First, as to Count 1, Langdon was alleged to have made inappropriate comments to and about staff, students, and parents. The particular students, staff, and parents were named in the notice or the attached key indicating the names of Students 1-6.[8] During the hearing, testimony demonstrated that Langdon commented to other staff members on Student 1's appearance, and further made disparaging comments about the student. Specifically, the witness testified, "that is when [Langdon] made the comment, 'oh, [the student's] mouth is open. Now I can really get a good look. This is what I was telling my mother about, [the student's] ugly, gnarly teeth.'" The witness further testified that Langdon then took a photograph of the student with her cell phone, and that Langdon then "looked at it, she laughed, said 'Oh, that's a great one.'" The witness then testified that Langdon showed the photograph to a co-worker.

{¶ 84} Langdon did not deny that she had conversations about the student's teeth, and admitted to conversing with her mother about Student 1's teeth. Langdon also admitted to taking a photograph of the student's face to show her mother. Langdon explained that she wanted to show her mother the teeth of the student who had bitten her in the past. However, this explanation has no school-related purpose and constitutes improper behavior as alleged in the notice.

---

8. As noted above, a key was provided with the notice that named the six students to whom reference was made in the letter. These exhibits were filed under seal and have been made a part of the record.

{¶ 85} The evidence related to the first count also showed that Langdon made improper comments to others regarding the personal hygiene needs of her students. On one occasion, a peer tutor student visited Langdon's classroom and showed interest in helping disabled students. Langdon asked the peer tutor if she was sure she wanted to be a special education teacher "and deal with students like this and change diapers and all kinds of mess like that?" Langdon made this comment in front of Student 2, who was bound to his wheelchair, wore a diaper, and required assistance with diaper changes. Student 2 was capable of understanding Langdon's comments and "was very disturbed and embarrassed" by Langdon's comments and the peer tutor's response.

{¶ 86} Langdon also made comments regarding Student 2's parents, including that they did not care about him and that they were too busy with their divorce and hating each other to care for him. Langdon also told Student 2 that he needed to tell his mother that if she cared for him, she would send diapers to school.

{¶ 87} Regarding comments to and about staff members, testimony revealed that Langdon told others in the school that she hated the school district's Special Education Supervisor and that she thought the supervisor was a "bitch." Langdon also warned others not to trust a school employee and stated that the employee was a "mouth" that "tries to get people in trouble." Langdon also threatened to punch an employee if that employee bothered a student in her class.

## Count 3

{¶ 88} Regarding the third count, that Langdon disclosed information about a student's confidential IEP during a fire drill, the hearing officer heard testimony that Langdon exited the school building while pushing Student 4's wheelchair. Langdon waived the student's IEP in the air and complained loudly in front of another student's parent and another staff member that the school was not following the IEP. The other parent who

witnessed the incident spoke to the staff about the requirements of Student 4's IEP and the incident, thus indicating that she had overheard Langdon's comments.

{¶ 89} As stated earlier, Langdon did not deny that she left the school building with the IEP, but explained that she was only fanning herself with it. Either way, it is undisputed that Langdon disclosed information within the IEP and that a parent of another child had concerns with noncompliance of the IEP as a result of Langdon's comments. The contents of this student's IEP should have remained confidential.

## Count 4

{¶ 90} Regarding the fourth count, that Langdon engaged in inappropriate physical conduct with students by grabbing, jerking, and pushing them, the hearing officer heard testimony that Langdon "ripped" apart the hands of a student and an aide. The aide and student were holding hands when Langdon approached, grabbed both of their hands, and "ripped them apart," yelling "don't hold his hand" to the aide. Langdon's action upset the student and caused him to hit the aide. Despite Langdon denying that the incident ever occurred, the hearing officer made an express finding that "such incident did occur."

{¶ 91} Langdon also called Student 5 "evil," "devil child," and "a bad seed" after the child banged a table. Student 5 is autistic, lower-functioning, wheel-chair bound, and has limited verbal skills. After the student banged the table, Langdon grabbed the student's hands, crossed them tightly, and struggled with the student. Again, despite Langdon's general denial that the incident occurred, the Hearing Officer made a finding that it did.

## Count 6

{¶ 92} Regarding the sixth count, that Langdon created a hostile and negative learning and working environment, the hearing officer heard testimony that Langdon yelled at her aides, including one instance where an aide was singing a song to an upset student and Langdon demanded that she stop by yelling at the aide in front of the students. Langdon

yelled at other aides in front of students, demanding that they perform certain tasks or read paperwork. Langdon also yelled in a loud and harsh tone at a student's nurse for temporarily taping construction paper to a window so that the nurse could provide privacy to the student while she changed the student's diaper. This exchange was witnessed by the school's assistance principal, who permitted the nurse to proceed. Langdon also told the nurse to "shut up" if the nurse spoke to other aides in the room.

{¶ 93} Regarding the students, Langdon pulled a bookbag from a student's hand who had cognitive and memory problems and yelled at her for not having a folder. Langdon also took food away from Student 6 on multiple occasions and threw it away because the student was not eating fast enough.

### Count 8

{¶ 94} Specific to the eighth count, that Langdon called a student's nurse a "big, gross disgusting wildebeest," the hearing officer heard testimony that Langdon did call the student's nurse such names. Langdon did not deny that she "occasionally and privately" referred to the nurse as a "wildebeast" [sic]. Langdon expressed her remorse for having done so. Even so, the record is undisputed that Langdon engaged in the exact conduct alleged in the notice.

### K. Concluding Evidentiary Support

{¶ 95} After a full review of the record, we find that the common pleas court abused its discretion in finding that the Board's decision was not supported by reliable, probative, and substantial evidence where the record clearly demonstrates that it was. On at least three occasions, as previously pointed out, Langdon acknowledged her inappropriate conduct. The record demonstrates multiple ways Langdon's actions constituted misconduct and reflected negatively on the teaching profession. This is especially true where Langdon taught developmentally disabled students, and often directed her misconduct toward her students,

fellow staff members, and even the parents of her students. While not every single allegation was proven, the Department of Education presented ample evidence to support the Board's ultimate determination that Langdon engaged in conduct unbecoming a teacher.

{¶ 96} As previously stated, the common pleas court substituted its judgment for that of the Board, which it was not permitted to do, and failed to give due deference to the Board's resolution of factual conflicts and credibility issues. Having found that the Board's decision was properly supported, and that the common pleas court abused its discretion, we reverse the decision of the common pleas court and reinstate the decision of the Board in regard to Langdon's licensure request.

{¶ 97} Judgment reversed, and the decision of the Ohio Board of Education is reinstated.

HENDRICKSON, P.J., and M. POWELL, J., concur.