[Cite as *Bollinger v. Ohio Dept. of Edn.*, 2018-Ohio-3714.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

MARK A. BOLLINGER,

      APPELLANT,

      CASE NO.  9-18-07

      v.

STATE OF OHIO DEPARTMENT
OF EDUCATION, ET AL.,

      O P I N I O N

      APPELLEES.

Appeal from Marion County Common Pleas Court
Trial Court No. 17CV0599

Judgment Affirmed

Date of Decision:   September 17, 2018

APPEARANCES:

    *Dennis L. Pergram* for Appellant

    *Adam P. Bessler* for Appellees

**SHAW, J.**

{¶1} Respondent-Appellant, Mark A. Bollinger, appeals the February 23, 2018 judgment of the Marion County Court of Common Pleas, General Division, affirming the Resolution adopted by the Ohio State Board of Education which ordered that his five-year professional adolescence to young adult teaching license be permanently revoked.

{¶2} On appeal, Bollinger claims: (1) that the trial court erred in determining that the administrative agency's order in its Resolution was supported by reliable, probative and substantial evidence; (2) that the trial court erred in finding that the administrative agency adequately considered mitigating factors in determining discipline for Bollinger; and (3) that the trial court erred when it overruled Bollinger's motion to admit additional evidence and in finding that the State Board considered his objections to the hearing officer's recommendation.

*Factual Background and Procedural History*

{¶3} Bollinger had been a teacher for seventeen years and had been a coach for more than twenty years at the time of the administrative hearing in March 2017. During the 2014-2015 school year, Bollinger was employed as a Social Studies teacher at River Valley High School in Marion County and held a five-year professional adolescence to young adult teaching license, which was issued in 2015.

**{¶4}** On April 23, 2015, at 12:51 a.m., Bollinger sent a text message to "Student 1," a 19-year-old female student in the senior class at River Valley High School, but whom Bollinger did not have in class. The context of the text message was regarding a joke that Student 1 helped Bollinger play on a friend, the boyfriend of "Witness 2."[1] This text message was the first of many exchanged between Student 1 and Bollinger over the next four weeks prior to Student 1's graduation from River Valley High School.

**{¶5}** Bollinger and Student 1 continued to communicate initially through text message and then exclusively through Snapchat regularly.[2] Student 1 contemporaneously discussed this burgeoning relationship with Witness 2, and shared some of the texts that Bollinger had sent to her as she received them. Prior to graduation, Student 1 met Bollinger on isolated roads to talk about problems Student 1 was having with her parents. Student 1 claimed that she and Bollinger "made out" during these meetings, although Bollinger claims that this did not happen until after Student 1 had graduated.

**{¶6}** On or about May 24, 2015, the approximate date of Student 1's graduation from River Valley High School, Bollinger and Student 1 met at his

---

[1] The aliases "Student 1" and "Witness 2" were assigned to these individuals to keep their identities confidential during the administrative proceedings. "Witness 2" was initially dubbed "Student 2," but was apparently changed to reflect that she was a graduate of River Valley High School and attending college at all times relevant to the hearing.

[2] Snapchat is a social media platform that maintains as one of its core concepts that any pictures, videos or messages sent between users are only available for a short time before they are deleted or otherwise become inaccessible.

parents' home. Student 1 claimed that Bollinger gave her a massage, while she was clothed in only spandex shorts and a sports bra. Bollinger disputed this characterization and maintained he was simply patting Student 1 on the back and consoling her after she confided in him the details of being raped while on Spring Break several weeks prior. After graduation, Student 1 and Bollinger continued to maintain a relationship and communicate through Snapchat.

{¶7} On or around June 20, 2015, Bollinger reserved a hotel room in Columbus and purchased alcohol. Witness 2 and Student 1 arrived at the hotel room after communicating with Bollinger. Both Witness 2 and Student 1, who were under the legal age to consume alcoholic beverages, claimed that Bollinger was present while they drank the alcoholic beverages he purchased. However, Bollinger maintained that neither Witness 2 nor Student 1 imbibed in his presence, and he claimed to have left the hotel room before Witness 2 and Student 1 consumed the alcoholic beverages.

{¶8} Shortly thereafter, Witness 2, feeling uneasy about the situation, told her mother about the relationship between Bollinger and Student 1. Witness 2's mother contacted her ex-husband, who was on the local school board at the time. The School Board then notified the River Valley School District Superintendent. Bollinger was placed on administrative leave pending an investigation by the Marion County Sheriff's Office and the School District. The Sheriff's Department

eventually determined that no crime had occurred. However, the School District hired an outside investigator and launched an internal investigation.

{¶9} The School District's investigator interviewed Student 1, who initially told the investigator that nothing inappropriate happened with Bollinger while she was a student at River Valley High School. However, when the investigator met with Witness 2, he obtained hundreds of text messages between Student 1 and Witness 2, some of which were screenshots of the text conversations between Bollinger and Student 1, including the April 23, 2015 text which initiated the relationship. These text messages contradicted the statements Student 1 initially made to the investigator, and indicated that Bollinger and Student 1 had "made out" numerous times prior to Student 1 graduating from River Valley High School. This discrepancy prompted the investigator to interview Student 1 for a second time and confront her with the text messages. Student 1 later claimed that she felt pressured from Bollinger to lie to law enforcement and the School District's investigator about the nature of their relationship. Bollinger did not answer the questions posed by the investigator upon the advice of counsel.

{¶10} On July 23, 2015, the investigator submitted his report to the School District's legal counsel. In his report, the investigator concluded that Bollinger violated the School District's policies by engaging in an inappropriate relationship with Student 1 while she was a student at River Valley High School and shortly

after she graduated. The investigator further found that Bollinger was insubordinate for failing to follow orders of the Superintendent and High School Principal, which required him to comply with the School District's investigation.

{¶11} On July 29, 2015, the School District sent a letter to Bollinger notifying him that a pre-disciplinary meeting had been scheduled for July 30, 2015, due to his alleged violations of School Board policies. Bollinger attended the meeting with counsel.

{¶12} On July 31, 2015, the School District sent Bollinger a letter informing him that the Ohio Board of Education (the "State Board"), in a special session meeting, approved the Superintendent's recommendation to terminate all contracts with him because he violated their staff-student relations policies, staff conduct policies, and because he was charged with insubordination, and conduct unbecoming a professional for providing alcohol to underage people and encouraging or pressuring others to be dishonest with law enforcement.

{¶13} Bollinger and Student 1 continued their relationship after she left for college. In September 2015, Bollinger travelled to Student 1's college, reserved a hotel room and the pair had sexual intercourse. Bollinger visited Student 1 at college several times and continued to have a sexual relationship with her during her freshman year at college.

{¶14} In the fall of 2015, the Ohio Department of Education ("ODE") began investigating the situation. Both Student 1 and Bollinger were in communication with legal counsel from the ODE's professional conduct section and other local school officials. Student 1 claimed that throughout the investigation, Bollinger directed her responses and, in some cases wrote her responses to those investigating. In these correspondences, Student 1 purported to admit that she exaggerated the context and nature of her relationship with Bollinger in the text messages to Witness 2, and that nothing inappropriate occurred with Bollinger while she was a student.

*Administrative Proceedings*

{¶15} On November 16, 2016, the ODE issued a Notice letter to Bollinger of its intention to determine whether to limit, suspend, revoke, or permanently revoke his five-year professional adolescence to young adult teaching license issued in 2015, "for one or more of the following reasons."

**Count 1**
**On or about April 2015 and continuing after Student 1's graduation, during and around the time of [Bollinger's] employment as a social studies teacher with the River Valley Local School District, [Bollinger] engaged in an inappropriate relationship with Student 1, a high school student.**

**Count 2**
**On or about April to July 2015, during and around the time of [Bollinger's] employment as a social studies teacher with the River Valley Local School District, [Bollinger] engaged in a pattern of conduct that is unbecoming to the teaching profession when [Bollinger] failed to maintain an appropriate student-teacher relationship with Student 1, a high school student.**

> **Specifically, [Bollinger] exchanged electronic messages and telephone calls with Student 1 that were inappropriate and non-school related in nature.**
>
> **Count 3**
> **On or about May 24, 2015, Student 1 met [Bollinger] at [Bollinger's] parent's house where [Bollinger] gave Student 1 a massage while Student 1 was only partially clothed.**
>
> **Count 4**
> **On or about June 20, 2015, [Bollinger] met with Student 1 and [Witness 2], who were both under the legal drinking age at the time, at a hotel room where [Bollinger] procured alcoholic beverages, which both students consumed while in [Bollinger's] presence.**
>
> **Count 5**
> **[Bollinger] aided Student 1 in her response to the allegations contained in Count 1 which were investigated by the River Valley Local School District and the Ohio Department of Education.**

(Nov. 16, 2016 Notice).

{¶16} The Notice issued by the ODE specified that each of these counts constituted a violation of R.C. 3319.31(B)(1), which permitted the State Board to "suspend, revoke, or limit" an educator's license for "[e]ngaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the * * * person's position." R.C. 3319.31(B)(1).

{¶17} Bollinger timely requested a hearing and an administrative hearing was held on March 27 and 28, 2017 before a hearing officer. The ODE presented the testimony of Student 1, Witness 2, the District Superintendent, the School District's investigator, and ODE's custodian of records for Bollinger's case.

Bollinger testified on his own behalf and presented the testimony of the River Valley High School Principal, Bollinger's wife, and two character witnesses.

**{¶18}** On June 30, 2017, the hearing officer submitted her report wherein she found that the ODE had proven by a preponderance of the evidence that Bollinger engaged in "conduct unbecoming to an educator" pursuant to R.C. 3319.31(B)(1). (Admin. Report June 30, 2017, at 37). The hearing officer further recommended in her report that the State Board permanently revoke Bollinger's teaching license.

**{¶19}** On October 17, 2017, the State Board held a meeting where they considered the hearing officer's report and recommendation along with Bollinger's objections. The State Board also considered a motion filed by Bollinger to permit additional testimony and documentary evidence, which the State Board overruled. The State Board adopted a Resolution revoking Bollinger's teaching license for "engaging in conduct unbecoming to the teaching profession" pursuant to R.C. 3319.31(B)(1). Specifically, the State Board found that:

> **[D]uring and around the time of his employment as a social studies teacher with the River Valley Local School District, Mr. Bollinger engaged in an inappropriate relationship with a student on or about April 2015 and continuing until after the student graduated; on or about April to July 2015, Mr. Bollinger failed to maintain an appropriate student-teacher relationship with the student/former student when he exchanged electronic messages and telephone calls with the student/former student that were inappropriate and non-school related in nature; on or about, May 24, 2015, Mr. Bollinger met with the former student at his parents' house, where he gave the former student a massage while the former student was only partially clothed; on or about June**

**20, 2015, Mr. Bollinger met with the former student and another student, who were both under the legal drinking age, at a hotel room, and he procured alcoholic beverages that both consumed while in his presence; and Mr. Bollinger aided the former student in preparing the former student's response to the allegations that he had an inappropriate relationship with the student which were investigated by the River Valley Local School District and the Ohio Department of Education.**

(Resolution Oct. 18, 2017, Item 7).

{¶20} In accordance with Ohio Administrative Code Rule 3301-73-22(A)(2)(b), the State Board ordered that Bollinger "be permanently ineligible to apply for any license issued by the State Board of Education." (Resolution Oct. 18, 2017, Item 7).

{¶21} Bollinger appealed the State Board's order set forth in the Resolution to the Marion County Court of Common Pleas pursuant to R.C. 119.12. Bollinger also filed a motion for the trial court to consider additional evidence, which the trial court overruled.

{¶22} On February 23, 2018, the trial court issued a judgment entry overruling Bollinger's assignments of error and affirming the order of the State Board to permanently revoke his professional teaching license.

{¶23} Bollinger appealed to this Court asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN FINDING THAT THE ADMINISTRATIVE AGENCY'S ORDER WAS SUPPORTED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED FINDING THAT THE ADMINISTRATIVE AGENCY ADEQUATELY CONSIDERED THE MITIGATING FACTORS IN DETERMINING THE DISCIPLINE FOR APPELLANT.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ERRED IN FINDING THAT THE ADMINISTRATIVE AGENCY DID NOT COMMIT ERROR BY DENYING THE APPELLANT'S MOTION TO PERMIT ADDITIONAL TESTIMONY TO BE TAKEN AND PERMIT THE INTRODUCTION OF FURTHER DOCUMENTARY EVIDENCE PURSUANT TO R.C. 119.12(K) AND FURTHER ERRED IN NOT FINDING THAT THE STATE BOARD FAILED TO CONSIDER APPELLANT'S OBJECTIONS TO THE HEARING OFFICER'S RECOMMENDATION.**

*First Assignment of Error*

{¶24} In his first assignment of error, Bollinger claims that the trial court erred in finding that the State Board's order was supported by reliable, probative, and substantial evidence.

*Standard of Review*

{¶25} Our standard of review in this case is aptly stated in, *Langdon v. Ohio Department of Education*, 12th Dist. Butler No. CA2017-02-025, 2017-Ohio-8356, ¶¶ 72-75.

**Ohio law is clear that the common pleas and appellate courts have a limited role when reviewing a Board's decision. In an administrative appeal pursuant to R.C. 119.12, the common pleas court reviews an order to determine whether it is supported by reliable, probative and substantial evidence and is in accordance with law. *In re Henneke*, 12th Dist. Clermont No. CA2011-05-039, 2012-Ohio-996, ¶ 88.**

**Reliable evidence has been defined as "dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true." *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). Probative evidence is "evidence that tends to prove the issue in question; it must be relevant in determining the issue." *Id*. Substantial evidence is evidence "with some weight; it must have importance and value." *Id*.**

**In determining evidentiary conflicts, common pleas courts are to give deference to the administrative resolution of such conflicts. *University of Cincinnati v. Conrad*, 63 Ohio St.2d 108 (1980). *The Ohio Supreme Court noted when the evidence before the common pleas court consists of conflicting testimony of approximately equal weight, the common pleas court "must" defer to the determination of the administrative body, which, acting as the finder of fact, had the opportunity to determine the credibility and weight of the evidence. Id*. at 111. In fact, "an agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993).**

> *On appeal to an appellate court, the standard of review is more limited.* **Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn., 63 Ohio St.3d 705, 707 (1992). In reviewing the common pleas court's determination that an order was or was not supported by reliable, probative and substantial evidence, this court's role is limited to determining whether the common pleas court abused its discretion. *Johnson–Hebb v. Clinton Cty. Pub. Defender*, 187 Ohio App.3d 17, 2010-Ohio-1817, ¶ 5 (12th Dist.). The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).**

(Emphasis added).

**{¶26}** The following evidence was adduced at the administrative hearing pertaining to Counts 1 through 5 detailed in the ODE's Notice letter.

### Counts 1 and 2[3]

**{¶27}** Counts 1 and 2 allege that Bollinger engaged in an inappropriate relationship with Student 1 while she was a high school student and that Bollinger engaged in a pattern of conduct unbecoming to the teaching profession when he exchanged text messages and telephone calls with Student 1 that were inappropriate and non-school related.

### Text Messages Prior to Graduation

**{¶28}** At the administrative hearing, Student 1 maintained that Bollinger had her access to her computer and deleted all the electronically stored messages

---

[3] Due the interrelated nature of the conduct alleged in these Counts, we will discuss the evidence pertaining to them together.

between them. (Tr. at 155). Student 1 also recalled that in the beginning she and Bollinger exchanged text messages and then moved to using Snapchat exclusively. However, screenshots of some of the initial text messages sent between Bollinger and Student 1 while she was still attending River Valley High School were preserved in text messages between Student 1 and Witness 2. As previously discussed, the earliest text message in the record exchanged between Bollinger and Student 1, sometime around April 23, 2015, involved Bollinger texting Student 1 to seek her assistance in playing a joke on his friend, Witness 2's boyfriend at the time.[4] Student 1 recalled that Bollinger "wanted to put a picture of Witness [2] on top of his pillow. I don't know why, but he thought it was funny so whatever." (Tr. at 148).

{¶29} At 12:51 p.m., Bollinger texted Student 1 to inform her how Witness 2's boyfriend took the joke. Bollinger: "I showed him. Said I was a fucking dick." (Ex. 6 at ODE_025). Bollinger then texted in the same conversation: "Thanks again for the help. Will talk again after you graduate. Or whenever I need help being a smartass." (Ex. 6 at ODE_026). Minutes later Bollinger texted Student 1: "Done with [Witness 2's boyfriend] … new target. You. Lol. Later." (Id.).

---

[4] The record indicates that Witness 2 graduated from River Valley High School two years ahead of Student 1 and was attending college. Witness 2 was dating a mutual friend of Bollinger's who was apparently much older than Witness 2.

{¶30} In a later text Bollinger carries on the joke conversation: "Thanks for the invite. Now I have ammo for the next victim! Lol. I wanted to tell you that earlier but everyone was standing there." (Ex. 6 at ODE_029). Student 1 responded: "No problem! And I'm not your next victim lol. Also it was nice of you to throw it on the ground lol." Bollinger replied: "I am an ass. Speechless? Haha. I was completely messing with you when I threw it down. You're a good kid!" Student 1 responded: "Haha I knew you were kidding! [Student 1] = [angel emoji] remember?" Bollinger replied: "I know better … remember?" (Ex. 6 at ODE_030).

{¶31} Thereafter, Student 1 initiated a text message exchange with Bollinger and he did not recognize her phone number. Bollinger texted: "Sorry. Told you I was deleting you. Didn't want it to be awkward … Didn't want you to think anything weird. Lol. About my intentions. Being safe/careful." (Ex. 6 at ODE_031). Bollinger explained in his text: "No offense. You're a great person but people talk and may jump to inappropriate conclusions. I am sure someone knows we have had a text conversation. It only takes one person to make shit up." (Ex. 6 at ODE_032). When Student 1 reveals that she has discussed their communication through texts with Witness 2, Bollinger stated: "Well, I don't want her thinking I am trying to hook up with you! Like her and [Witness 2's boyfriend]…" Student 1 responded: "I don't think she thinks that lol." Bollinger replied: "And you don't

either right?" Student 1 answered: "No not at all. Lol." Bollinger retorted: "Good. You're not my type! Hahaha" (Ex. 6 at ODE_034-035).

**{¶32}** Despite his alleged reservations, Bollinger continued to text with Student 1 regarding non-school related topics. In a separate text exchange Bollinger wrote: "And thanks for the putdown earlier. Nice of you." Student 1 responded: "When?" Bollinger replied: "Nothing, Lol." Student 1 inquired: "What putdown? Lol." Bollinger responded: "The old and disgusting inference. That I couldn't be attractive to a 20 year old." (Ex. 6 at ODE_037). Bollinger further stated in the same conversation: "Ha! No win. Either admit I'm hot or admit it's a putdown. Haha…" "Don't try and outsmart a smartass. Just be quiet and cute." (Ex. 6 at ODE_039). Bollinger further inquired of Student 1 how the relationship between Witness 2 and his friend was initiated, and asked that the contents of the conversation stay between the him and Student 1.

**{¶33}** Thereafter Bollinger sent another text stating: "Might have crossed a line." "Second guessing myself now. Delivery to your house." He further texted "I will cancel it." "Don't want parents asking questions." (Ex. 6 at ODE_044). When Student 1 questioned: "What was it?" Bollinger replied: "Flowers." Student 1 responded: "Oh, I thought you were going to get me something from VS."[5] (Ex.

---

[5] Student 1 testified at the administrative hearing that "VS" referred to Victoria's Secret. She explained that she and Bollinger had discussed lingerie. (Tr. at 155). In a text message conversation with Witness 2, Student 1 also mentioned that Bollinger said he would buy Student 1 "VS lingerie" because she has "a lot to learn" and that he can "teach" her. (Ex. 6 at ODE_096-097).

6 at ODE_101). Bollinger continued to text: "No! I will call—hoping they haven't delivered. They said late afternoon. So it should be ok to stop. Didn't put my name on it." Student 1 asked: "What would it say." Bollinger responded: "Someone likes you. Lol. Name just said 'me'." (Ex. 6 at ODE_101).

{¶34} Despite the apparent flirtatious nature of the text messages, Bollinger maintained that the content of the messages was just an expression of his sarcasm and humor, that some of the conversation was missing, and that his statements were taken out of context and were not indicative of an inappropriate relationship between him and Student 1. Bollinger also admitted that all of these text messages were exchanged with Student 1 prior to her last day of school, while she was still a high school student. (Tr. at 64).

*Additional Evidence of an Inappropriate Relationship with*
*Student 1 while she was a High School Student*

{¶35} Student 1 provided the following testimony establishing that an inappropriate relationship between Bollinger and herself had occurred while she was still a high school student. Student 1 testified regarding the first time she and Bollinger met in private. She explained that he dared her to go to his house in the middle of the night, which happened to be a Wednesday and a school night.[6] She recalled meeting Bollinger outside at approximately 2:00 a.m. During this first

---

[6] The record indicates that Student 1 and Bollinger lived near one another.

meeting, Bollinger grabbed her and kissed her. (Tr. 157). She recalled that she "kind of freaked out that night," so they then started "meeting up on random back roads." (Id.) She specifically recalled New Road as the name of one of the locations. She testified that during these meetings "we would just kiss, make out, random back roads in a car." (Id.) On direct examination of Student 1, the following exchange took place regarding the timing of the "make out sessions."

> **Counsel: Okay. This is before graduation?**
>
> **Student 1: Yeah, this is all before graduation. I can't tell you how many times.**
>
> **Counsel: Okay. Was it more than five?**
>
> **Student 1: Yeah, absolutely.**
>
> **Counsel: Was it just kissing and making out before graduation?**
>
> **Student 1: Yes.**

(Tr. at 158).

{¶36} Student 1's account of the timing of when these meetings occurred was corroborated by the contemporaneous text messages she sent to Witness 2. In a text message sent in early May of 2015, Witness 2 casually asked Student 1: "Anymore make out sessions" and Student 1 replied: "No not as of Friday night lol." (Ex. 6 at ODE_096).

{¶37} In another text conversation a few days later, Student 1 asked Witness 2: "Wanna hear about Mark and I or nah?" Witness 2 replied: "Sure!" Student 1

responded: "Another makeout sesh." (Ex. 6 at ODE_099). Student 1 further elaborated: "On 'New Road' then it started pouring rain." Witness 2 responded: "No idea where that is. You do realize that this is getting out of hand." Student 1 asked: "Am I going to get lectured? And yes I realize…" Witness 2 replied: "Not lectured. Just letting you know that the more you allow this behavior, the more likely someone will start a rumor." (Ex. 6 at ODE_099).

**{¶38}** Through the text messages exchanged between Student 1 and Witness 2 prior to Student 1's graduation and shortly thereafter, Witness 2 expressed concern and disapproval with Student 1's relationship with Bollinger, a sentiment Witness 2 reiterated during her testimony at the administrative hearing. While Student 1 acknowledged the beginnings of an affair in the text messages, she shared with Witness 2 that she was developing feelings for Bollinger and that she felt "stupid for liking him." (Ex. 6 at ODE_103).

**{¶39}** For his part, Bollinger adamantly denied that he and Student 1 had an inappropriate relationship while she was still a high school student. He further discounted Student 1's text messages to Witness 2 as exaggerations and lies that Student 1 made up to make Witness 2 jealous.[7] However, Bollinger admitted at the administrative hearing that he met Student 1 on New Road at least one time before her graduation and this location was chosen to avoid someone making an

---

[7] Bollinger maintained at the hearing and on appeal that Student 1 and Witness 2 were engaged in a lesbian relationship, which both Student 1 and Witness 2 denied at the hearing.

inappropriate allegation. Bollinger maintained that during these meetings Student 1 simply "vented" to him about the problems she was having with her parents and he was there for her support. (Tr. at 99). Bollinger maintained that Student 1 kissed him on the cheek at graduation, but that nothing inappropriate had occurred prior to that point.

### *Count 3*

{¶40} Count 3 alleged that Bollinger committed misconduct when he met with Student 1 at his parents' house, on or about May 24, 2015, and gave Student 1 a massage while she was partially clothed.

{¶41} At the administrative hearing, Student 1 testified that Bollinger took her to his parents' house where Bollinger was housesitting while his parents were out of town. She recalled that this occurred two nights in a row and around the night before graduation. Student 1 remembered that Bollinger gave her "a card with money on it, Reese's and lotion." (Tr. 158). She claimed that he was giving her a "back rub that night" when Bollinger's wife unexpectedly came to the house. (Id). Student 1 claimed Bollinger told her hide in the basement for 15 to 20 minutes until his wife left. Student 1 recalled snapchatting with Witness 2 while she was in the basement. In text messages later exchanged between Student 1 and Witness 2, Student 1 recounted the events describing Bollinger's wife interrupting Bollinger giving Student 1 a "massage," and Bollinger directing Student 1 to hide in the

basement, throwing "all of my stuff/clothes down there" where Student 1 hid for 20 minutes until Bollinger's wife left. (Ex. 6 at ODE_115).

{¶42} Bollinger admitted that Student 1 was alone with him at his parents' house around the time of graduation. He further acknowledged that Student 1 was dressed in a sports bra and leggings, which he claimed was typical running attire for her. He also admitted that he "rub[bed] on her back" during this time, but claimed that he was simply consoling her while she was divulging to him that she had been raped over Spring Break. (Tr. at 72). He denied that he directed Student 1 to hide in the basement when his wife came to the house, but maintained that Student 1 went to the basement on her own accord. He further maintained that his wife was aware that Student 1 was in the house. (Tr. at 77).

### *Count 4*

{¶43} Count 4 of the ODE's Notice alleged that on or about June 20, 2015, Bollinger met with Student 1 and Witness 2, who were both under the legal drinking age, in a hotel room where he procured alcoholic beverages, which both Student 1 and Witness 2 consumed in his presence.

{¶44} At the administrative hearing, Student 1 testified that she and Witness 2 met Bollinger at a hotel. She explained that "he got us alcohol; and, yeah, we just hung out there for a while." (Tr. at 160). Student 1 recalled that "all of us" were drinking the Mike's Hard Lemonade and "a purple bottle of something" that

Bollinger had purchased. (Id.). She further testified on cross-examination that Bollinger was in the room when she and Witness 2 were drinking, and that Bollinger "drank there too." (Tr. at 223). She recalled arriving at the hotel room with Witness 2 in the evening. Student 1 described the hotel room as containing two beds. She recalled that she and Witness 2 were seated on one bed with Bollinger on the other. Student 1 stated that she moved to Bollinger's bed for a short period of time when Witness 2 left the room. She estimated that they were there "less than two hours, less than an hour." (Tr. at 161). She explained that Bollinger's wife kept calling on his phone, prompting him to leave the room several times, before Bollinger eventually left the hotel. Student 1 recalled that she and Witness 2 left the hotel room five minutes after Bollinger.

{¶45} Witness 2 also testified at the administrative hearing regarding meeting Bollinger at the hotel room in Columbus. She explained that Bollinger was communicating with Student 1 and invited them to the hotel room. They were aware that Bollinger had purchased alcohol and they intended to "sit around and talk." (Tr. at 289). Witness 2 recalled a purple "big bottle of alcohol" and "wine coolers of a sort." (Tr. at 291). She also described two beds in the hotel room and stated that initially she and Student 1 sat on one bed, while Bollinger sat on the other. She stated that "I left the room for a few minutes to use the restroom; and when I came back, Mr. Bollinger and Student 1 were [on] one bed." (Tr. at 291). Witness 2

confirmed that she and Student 1 were drinking but could not remember if Bollinger was also drinking. She remembered that Bollinger left the hotel room after he received a phone call from his wife.

{¶46} With regard to this incident, Bollinger admitted that he reserved a hotel room in Columbus and had purchased Mike's Hard Lemonade and a bottle of Viniq for himself. He recalled that Student 1 texted him and asked what he was doing. He explained to Student 1 that he went to Polaris to go shopping and went to the hotel "because it had been a hell of a week." (Tr. at 80). He recalled that Student 1 and Witness 2 sat on one bed and he on the other. He acknowledged that Student 1 sat on the bed with him for five minutes before he left. Bollinger claimed that he later discovered that Student 1 and Witness 2 had consumed the alcoholic beverages he had purchased.

{¶47} Bollinger explained that he had become frustrated with Witness 2, whom he had felt was spreading lies about him, and frequently left the room to remove himself from the situation. He stated that he left in a hurry and told Student 1 and Witness 2 to either leave the alcoholic beverages in the room or poor them down the sink. He surmised that Student 1 and Witness 2 must have consumed the alcoholic beverages when he was out of the room. Bollinger was adamant that he did not imbibe the alcoholic beverages that night and did not see Student 1 and Witness 2 drink them.

*Count 5*

{¶48} The allegations in Count 5 pertain to allegations that Bollinger aided Student 1 in her responses during the School District's and the ODE's investigation of an inappropriate relationship between Bollinger and Student 1 while she attended River Valley High School.

{¶49} Student 1 testified that shortly after the hotel room incident, Witness 2 informed her that the School Board and the law enforcement knew of her relationship with Bollinger. Student 1 recalled that she and Bollinger "made up a story to tell" because she did not want to get into trouble. (Tr. at 161). Specifically, she stated that she lied to the police, "nothing happening, no kiss before graduation, nothing like that." (Tr. at 162). She told Mr. Duckett, the School District's investigator, the same story the first time she spoke with him. Student 1 admitted to lying "lots of times." She explained that she felt pressured by Bollinger to lie because he made her feel like the entire situation was her fault. She stated that Bollinger "always brought in the guilt trip of the kids. He is going to lose everything, so obviously I felt awful. I felt—I did feel like it was my fault." (Tr. at 163).

{¶50} Student 1 further recalled Bollinger writing statements for her to School Board officials and the ODE investigators. She recalled Bollinger picking her up from college and taking her to a hotel room where he asked her to write an

email to the School District Superintendent in September 2015. In this email, Student 1 purportedly states that nothing inappropriate with Bollinger occurred while she was a student at River Valley High School. She testified that she initially resisted sending the email, but that Bollinger had threatened to stop talking to her if she did not send it. She explained that she fell in love with Bollinger and that he "got in [her] head" and she was willing to lie to keep him in her life. (Tr. at 210). Student 1 claimed that she told Bollinger that she would send it if he wrote it and that is what occurred.

{¶51} Student 1 also identified a lengthy email that she claimed Bollinger wrote and had her send to Mr. Haydocy of the ODE from her email address in October of 2015. In this email, Student 1 purportedly explains the innocent friendship between she and Bollinger and takes responsibility for exaggerating the nature of the relationship to Witness 2. In the email, Student 1 also purportedly states that Mr. Duckett, the School District's Investigator, essentially bullied her and took the text messages exchanged between them out of context without allowing her to explain their true nature.

{¶52} Student 1 explained that Bollinger pressured her to lie to Mr. Haydocy, which she did not want to do, so she fabricated an email address for Mr. Haydocy. Student 1 also testified regarding a photograph that she claimed demonstrated that Bollinger had access to her email account. According to Student 1, the exhibit

depicts her email account opened on Bollinger's laptop with an email displayed allegedly from Student 1 to Mr. Haydocy's fictitious email address made up by Student 1. (Tr. at 281, Ex. Q).

{¶53} For his part, Bollinger denied writing Student 1's correspondence to the School District Superintendent, but admitted that he did review the email and offer suggestions.

{¶54} Both the testimony of Student 1 and Bollinger indicate that at the time when they first began to communicate, Student 1 was struggling with excessive drinking, pressure from her parents, illegal substance use, and dealing with the aftermath of a traumatic experience, which Student 1 later revealed to Bollinger was a sexual assault that occurred over Spring Break. Student 1 also confided in Bollinger after she had graduated that she had cheated on a calculus exam while in high school. Bollinger explained that he did not feel comfortable referring Student 1 to the guidance counselor at the school because the "students don't trust the counselors." (Tr. at 525). Bollinger explained that it is in his nature to help others and he wanted to help Student 1. Bollinger claimed that he "begged" Student 1 to seek professional help because she could not talk to her parents about the rape over Spring Break. (Tr. at 558). When asked by his counsel, why Bollinger began a sexual relationship Student 1, Bollinger stated that he "stubbed his toe" and that he wanted to "save" Student 1." (Tr. at 554).

*Analysis*

{¶55} On appeal, Bollinger maintains that the trial court erred in finding that the State Board's decision to permanently revoke his teaching license was supported by reliable, probative, and substantial evidence on primarily two grounds. First, Bollinger takes issue with the level of deference the trial court gave to the agency's finding of facts in support of its decision. Essentially, Bollinger quarrels with the State Board's determination that Student 1's version of the events was more credible than his own. Second, Bollinger contends that the trial court erred when it found that the State Board's reliance on events that occurred between Bollinger and Student 1 after she ceased to be a student was a proper basis to permanently revoke his license.

{¶56} As previously stated, the trial court in its review of the State Board's order must apprise all the evidence as to the credibility of the witnesses and the probative character of the evidence. The court must also examine the weight of the evidence. If there is conflicting testimony of approximately equal weight, the court should defer to the determination of the administrative body, which had the opportunity to observe the demeanor of the witness and weigh their credibility. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111 (1980). In engaging in this review, the trial court concluded that the "findings of the Board of Education are not internally inconsistent, as the Board found the version of events as stated by

Student 1 was more believable than the testimony adduced by Plaintiff-Appellant on a number of disputed matters." (Doc. No. 17 at 6).

**{¶57}** The ODE had the burden to prove by a preponderance of the evidence that misconduct relevant to R.C. 3319.31 occurred in this case. Notably, Bollinger does not contend that an inappropriate relationship between a teacher and current student fails to meet this standard. A "[p]reponderance of the evidence entails the 'greater weight of the evidence,' evidence that is more probable, persuasive, and possesses greater probative value." *Davis v. KB Compost Servs., Inc.*, 9th Dist. Summit No. 21186, 2002-Ohio-7000, ¶ 10. A "preponderance" of evidence is "that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St. 3d 446, 2011-Ohio-6117, ¶ 54.

**{¶58}** The relevant portion of R.C. 3319.31 at issue in this case states:

**(B) For any of the following reasons, the state board of education, in accordance with Chapter 119. and section 3319.311 of the Revised Code, may refuse to issue a license to an applicant; may limit a license it issues to an applicant; may suspend, revoke, or limit a license that has been issued to any person; or may revoke a license that has been issued to any person and has expired:**

**(1) Engaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the applicant's or person's position [. . .]**

{¶59} At the outset, we acknowledge that the record reveals that Student 1 admitted to lying several times throughout the investigations conducted by the School District and the ODE, and that she also committed perjury when she initially testified at the administrative hearing that she had not communicated with Bollinger since October of 2016, but then later admitted that she had seen him a week prior to the administrative hearing in March of 2017. However, Student 1's testimony supporting the existence of an inappropriate relationship while she was a high school student was corroborated by other evidence adduced at the hearing, including Bollinger's own admissions.

{¶60} The record establishes that Bollinger placed himself in numerous precarious positions with Student 1, from which inferences could be made by a rational trier of fact to lend credibility to Student 1's testimony. For example, the nature of the texts exchanged between Bollinger and Student 1 prior to graduation were non-school related and occurred at questionable times for a teacher to be texting a student. Moreover, Student 1's contemporaneous sharing of the text messages with Witness 2 and the discussion prompted between them reasonably support a conclusion that a budding romantic relationship was developing between Bollinger and Student 1 in the beginning of May 2015.

{¶61} Despite his own claimed caution in these texts, which itself indicated an awareness on his part of the potential inappropriate nature of their relationship,

Bollinger continued to send objectively flirtatious texts to Student 1 and made arrangements to meet her alone in isolated places—i.e., on New Road and at his parent's home. Even the kiss on the cheek at graduation raises suspicion with Bollinger's testimony as Bollinger admitted that he did not have Student 1 as a student in his classroom and the record does not indicate that Student 1 and Bollinger had any type of a relationship prior to April 23, 2015.

**{¶62}** Moreover, Bollinger was given ample opportunity throughout the proceedings to refute Student 1's testimony regarding when their intimate relationship began and to impeach her credibility. However, even though evidentiary conflicts existed, the record contains substantial evidence supporting the State Board's findings with regard to an inappropriate relationship between Bollinger and Student 1 prior to graduation. Therefore, we conclude the trial court did not act unreasonably nor did it abuse its discretion in affirming the State Board's decision in finding that the decision was supported by the sufficient degree of evidence.

**{¶63}** Next, Bollinger argues that the State Board should have been precluded from hearing any evidence regarding events that occurred after Student 1 ceased to be student at River Valley High School.[8] Initially, we observe that

_____

[8] In his reply brief Bollinger argues that events which pertain to the allegations of misconduct after Student 1 ceased to be a student are not within the purview of the State Board and he further maintains that the State Board's consideration of these events present an error of law that must be reviewed *de novo*. However, Bollinger fails to cite any authority to support this proposition.

nowhere in R.C. 3319.31 or Ohio Admin. Code 3301-73-21 is there a timeframe for the limitation of such evidence. On the contrary, the administrative agency found the reasoning expressed in *Flaskamp v. Dearborne Public Schools, et al.*, to be persuasive in reviewing this issue. 385 F.3d 935, 944 (6th Cir. 2004). In *Flaskamp*, a teacher and student communicated through instant messaging, jokes, and met privately to talk prior to graduation. After the student graduated, the pair continued to stay in contact and the relationship evolved into a sexual one. Flaskamp brought a § 1983 action against the school district and school board, stemming from the school board's denial of tenure due to the teacher's alleged intimate relationship with the former high school student. The Court in *Flaskamp* concluded that:

> **[O]n the basis of Flaskamp's answers [to inquiries about the nature of the relationship before and after graduation] as well as other evidence that Flaskamp and Doe had engaged in a sexual relationship after graduation, the board rationally could conclude that the romantic relationship started before graduation. The type of intimate association for which Flaskamp seeks constitutional protection does not generally spring into existence at one point in time; it develops over a period of time. A school board thus legitimately could be concerned that a romantic relationship between a teacher and former student soon after graduation provides circumstantial evidence that the same relationship existed before graduation.**

*Flaskamp*, 385 F.3d at 944.

{¶64} With respect to Count 5 we are not persuaded by Bollinger's argument that his conduct after Student 1 graduated was immaterial or outside the bounds of the State Board's review. The State Board could reasonably determine that

-31-

allegations involving Bollinger pressuring Student 1 to obstruct the School District's and State Board's investigations into whether he and Student 1 had commenced their inappropriate relationship prior to her graduation are relevant and probative to inquiry of whether he committed conduct unbecoming to the profession pursuant to R.C. 3319.31(B)(1).

{¶65} The same rationale pertains to the allegations in Count 4 regarding Bollinger supplying alcohol to Student 1 and Witness 2 who were under the legal age to consume alcoholic beverages. Even assuming Bollinger did not see Student 1 and Witness 2 drink the alcoholic beverages in his presence, he admittedly left two individuals, one of whom he knew to have a problem with excessive drinking, in a hotel room with enough alcohol to impair one, if not both Student 1 and Witness 2. Moreover, both Student 1 and Witness 2 testified that they drove separately from Bollinger to the hotel room in Columbus.

{¶66} Accordingly, for the reasons stated above we do not find that the trial court abused its discretion in concluding that the State Board's order finding that Bollinger engaged in an inappropriate relationship with Student 1 was supported by reliable, probative and substantial evidence in the record and is in accordance with law. Moreover, we also do not find that the trial court abused its discretion in determining in these circumstances that conduct between Bollinger and Student 1 after she graduated was relevant to the inquiry of whether Bollinger engaged in

conduct unbecoming to the profession. Therefore, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶67}** In his second assignment of error, Bollinger claims that the trial court erred in finding that the hearing officer and the State Board gave due consideration to the mitigating factors provided by the Ohio Administrative Code when determining Bollinger's discipline. Ohio Administrative Code Section 3301-73-21(B) states:

> **If the state board finds that a person has engaged in conduct unbecoming as described in paragraph (A) of this rule, then the state board may take the following mitigating and aggravating factors, as applicable and appropriate, into consideration when determining a final action under division (B)(1) of section 3319.31 of the Revised Code:**
>
> **(1) The nature and seriousness of the crime or misconduct;**
>
> **(2) The extent of the person's past criminal activity or misconduct;**
>
> **(3) The age of the person when the crime or misconduct was committed;**
>
> **(4) The amount of time that has elapsed since the person's last criminal activity or misconduct;**
>
> **(5) The conduct and work activity of the person before and after the criminal activity or misconduct;**
>
> **(6) Whether the educator has completed the terms of his/her probation or deferred adjudication;**

**(7) Evidence of rehabilitation and evidence of whether the educator is amenable to rehabilitation as defined by paragraph (E) of rule 3301-20-01 of the Administrative Code;**

**(8) Whether the applicant is eligible for licensure pursuant to rule 3301-20-01 of the Administrative Code;**

**(9) Whether the person fully disclosed the crime or misconduct to the state board or the employing school district;**

**(10) Whether licensure will negatively impact the health, safety, or welfare of the school community and/or statewide education community;**

**(11) Whether the educator has previously been disciplined by the state board of education or any other licensing entity, including, but not limited to, out-of-state licensing entities;**

**(12) Whether the school district or educational entity imposed any penalties, sanctions, or other conditions addressing the educator's professional conduct;**

**(13) Whether the educator has been employed in any capacity within a school district or educational entity after having a license, certificate, or permit revoked; and**

**(14) Any other relevant factor.**

{¶68} On appeal, Bollinger directs our attention to numerous exhibits filed on his behalf, which were comprised of letters from students and parents praising him as an educator, a coach, and a mentor; prior administrative evaluations giving him the highest marks; pictures documenting Bollinger's extensive church and community involvement; and the testimony from character witnesses. The hearing officer specifically addressed the above-mentioned factors in her report and found

-34-

that "[t]he severity of the aggravating factors far outweighs any mitigating factors in this case." (Admin. Report June 30, 2017, at 36). In recommending that the State Board permanently revoke Bollinger's teaching license, the hearing officer specifically observed:

> **Mr. Bollinger started an inappropriate relationship with a high school senior that continued after Student 1 graduated from high school. Although Mr. Bollinger denied that anything inappropriate happened prior to Student 1's graduation, Mr. Bollinger's own text messages show that this was not the case. Mr. Bollinger crossed the student-teacher boundaries during the first night he texted Student 1.**
>
> **Mr. Bollinger's relationship with Student 1 increased in intensity once Student 1 graduated from high school and entered college. Mr. Bollinger may have been a great teacher and had an outstanding reputation prior to his relationship with Student 1, but it has been significantly tarnished by his behavior. Unfortunately, even if Mr. Bollinger is apologetic for some of his behavior, and believes he "stubbed his toe," people cannot simply disregard certain choices. Mr. Bollinger tried to paint himself as the victim in this situation, but Student 1 was the true victim.**

(Admin. Report June 30, 2017, at 37). In addition, the State Board in its Resolution ordering the permanent revocation of Bollinger's teaching license also specifically stated that it considered the factors contained in Ohio Admin. Code 3301-73-21(B).

{¶69} We acknowledge that the record contains multiple instances of Bollinger's positive impact on the school, his students, and the community. However, our review of the record reveals support for the hearing officer's findings that Bollinger's conduct during the administrative proceedings in assisting Student

1 with obstructing the investigation of their inappropriate relationship while she was a high school student; his apparent lack of accountability and remorse for his consistent demonstration of poor judgment; and his attempts to place the entirety of the blame on Student 1 for conduct he initiated and willingly participated in all support the administrative agency's determination that the mitigating factors do not outweigh the severity of the misconduct.

{¶70} Accordingly, we cannot find that the trial court abused its discretion when it determined that the Administrative Agency adequately considered the mitigation factors when it sanctioned Bollinger and permanently revoked his teaching license. Therefore, the second assignment of error is overruled.

*Third Assignment of Error*

{¶71} In his third assignment of error, Bollinger argues that the trial court erred in denying his motion to permit additional testimony and evidence to be incorporated into the record. R.C. 119.12(K) provides that common pleas courts hearing administrative appeals are "confined to the record as certified to it by the agency." R.C. 119.12(K) permits a common pleas court, in its discretion, to admit additional evidence, but only if it first determines that (1) the additional evidence is "newly discovered" and (2) a reasonably diligent search prior to the administrative hearing would not have ascertained the evidence. *Hetrick v. Ohio Dept. of Agriculture*, 10th Dist. Franklin No. 15AP-944, 2017-Ohio-303, ¶ 44.

{¶72} In a memorandum supporting his motion to supplement the record, Bollinger did not disclose the "newly discovered evidence," but simply stated that "[s]ubsequent to the administrative hearing, Student 1 admitted in writing that she lied on other issues at the administrative hearing." (Doc. No. 10). Bollinger further argued that the "admitted perjury" is "material" to the administrative decision and "only came to light after the administrative hearing." (Id.). The trial court found that Bollinger did not meet his burden in establishing that the "newly discovered evidence" was material and could not have been discovered by due diligence prior to the final administrative determination. As the trial court noted, "[g]iven that Student 1 admitted to lying at the administrative hearing, and admitted to telling lies during the early portions of the investigation of the matter this Court agrees that the Motion * * * is not well taken. * * * Given the lack of specificity, it appears that the Motion would be needlessly cumulative of the fact that Student 1 told lies during the early stage of the investigation and at the administrative hearing." (Doc. No. 17 at 8).

{¶73} Upon our review of the record, we cannot find that the trial court abused its discretion in overruling Bollinger's motion to supplement the record with additional testimony on this basis. Accordingly, we overrule the third assignment of error.

{¶74} For all these reasons, the assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**